*Tagged opinion*



**ORDERED in the Southern District of Florida on February 8, 2024.**

**Laurel M. Isicoff, Judge**
**United States Bankruptcy Court**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division
www.flsb.uscourts.gov

In re:                                                   Chapter 11

AMERICA-CV STATION GROUP, INC.,          Case No. 19-16355-BKC-LMI
CARIBEVISION HOLDINGS, INC.,              Case No. 19-16359-BKC-LMI
AMERICA-CV NETWORK, LLC,                  Case No. 19-16976-BKC-LMI
CARIBEVISION TV NETWORK, LLC,             Case No. 19-16977-BKC-LMI

        Debtors.                         (Jointly Administered Under
                                          Case No. 19-16355-BKC-LMI)

_____/

## <u>ORDER ON REMAND</u>

Chapter 11 of the Bankruptcy Code is most successful when parties, even those who identify as adversaries, work collaboratively, or at least cooperatively, towards an outcome. But because collaboration or cooperation is not always possible, Chapter 11 provides a debtor with tools to its fresh start regardless, within a framework that provides protections to those who are compelled to accept treatment to which they object. In this case, the majority shareholders of

the four Debtors were deprived, without these protections, of their bargained for opportunity to be the majority shareholders in the Reorganized Debtors. The Eleventh Circuit has left to this Court how to resolve the consequences of what occurred.

## **FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]**

On May 14, 2019, America-CV Station Group, Inc. ("America-CV Station") and Caribevision Holdings, Inc. ("Caribevision Holdings") each filed a voluntary petition in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") under Case Nos. 19-16355-BKC-AJC (the "America-CV Station Case") and 19-16359-BKC-AJC (the "Caribevision Holdings Case"), respectively. On May 28, 2019, America-CV Network, LLC ("America-CV Network") and Caribevision TV Network, LLC ("Caribevision TV") each also filed a voluntary petition in the Bankruptcy Court for relief under Chapter 11 of the Bankruptcy Code under Case Nos. 19-16977-BKC-AJC (the "America-CV Network Case") and 19-16976-BKC-AJC (the "Caribevision TV Case"), respectively (the America-CV Station Case, the Caribevision Holdings Case, the America-CV Network Case, and the

---

[1] The findings of fact and conclusions of law set forth in this Order constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr. P.") and are based on the Debtors' *First Amended Joint Disclosure Statement for Chapter 11 Plans of Reorganization Proposed by America-CV Station Group, Inc., Caribevision Holdings, Inc., America-CV Network, LLC and Caribevision TV Network, LLC* (ECF #156) (the "Disclosure Statement"), other documents on the bankruptcy court docket as noted, findings of the Eleventh Circuit or, as noted, the deposition testimony or declarations filed by the various parties in support of the relief addressed in this Order. All parties agreed no evidentiary hearing was necessary.

Caribevision TV Case are sometimes collectively referred to herein as the "Chapter 11 Cases"). (When referring to America-CV Station, Caribevision Holdings, America-CV Network and Caribevision TV collectively during the bankruptcy cases they will be referred to as the "Debtors" and for the time following the effective date of the respective bankruptcy plans, they will be referred to collectively as the "Reorganized Debtors").

The business that became the Debtors was established approximately twenty years prior to the bankruptcy, apparently by Alejandro Burillo, the principal of Pegaso Television Corp., with his friend Ramon Diez-Barroso, and Carlos Barba, a former television personality who Mr. Burillo had met previously[2]. Sometime in 2008, Spain's Telecinco Gestavision n/k/a Mediaset ("Mediaset") purchased an indirect 38% interest in the business through Pegaso Television Corp. Around the same time, Carlos Vasallo joined Barba TV Group LLC. and in 2010, Carlos Vasallo took full control of Barba TV Group, LLC. Barba TV Group, LLC is now known as Vasallo TV Group, LLC (Vasallo TV Group, LLC and Carlos Vasallo are collectively referred to as the "Vasallo Group").

At some point, the entities that made up the business (the "Caribevision

---

[2] There is almost no information regarding the formation of the business that became the Reorganized Debtors. The Disclosure Statement (hereafter defined) states the Debtors' business had been established twenty years prior. The *Declaration of Carlos Vasallo in Support of Requests for Relief* (ECF #467-1) (the "Vasallo Declaration") provided some background but some of it was inconsistent with the Disclosure Statement information. Mr. Burillo's deposition was not of much help as Mr. Burillo is very ill and his testimony appeared confused at times. *See* Burillo Dep. (ECF #487). Most of the background is not integral to the holdings in this Opinion, so any inaccuracies in those facts are irrelevant. The background is provided for context to the reader regarding the relative interests and history of the Pegaso and Vasallo holdings and how they came to be and evolved.

Companies") entered into a joint venture with a company called America Teve, which was owned by Omar Romay ("Romay"). The proposed combined company would be owned 50% by the Caribevision Companies and 50% by Romay.

In May 2010, the Federal Communications Commission ("FCC") approved the joint venture with Romay, and, as result, a new entity, America-CV Station, was formed and became the owner of all of the television broadcasting licenses. Another new entity, America-CV Network, was formed to take control of the operations. The new entities were owned 50% by the Caribevision Companies and 50% by  Romay's group of companies (the "Romay Parties") through two holding companies - Caribevision Holdings and Caribevision TV.

By 2011, Romay defaulted on his obligations under the joint venture agreement. The Caribevision Companies sued the Romay Parties (the "Romay Litigation") which was still ongoing when the Chapter 11 Cases were filed. In fact, the Chapter 11 Cases were filed just prior to the trial in the Romay Litigation.

There was a great deal of tension and litigation amongst the various parties, including between and among the Romay Parties, the Vasallo Group, and the Pegaso Group[3].  While litigation with the Romay Parties was ongoing, it appears that some time before the filing of the Chapter 11 Cases, pursuant to a settlement, the Vasallo Group and the Pegaso Group had, at least, reached a truce, with Mr. Vasallo acting as President and CEO of the various operating

---

[3] The Pegaso Group, according to Mr. Vasallo, was made up of Pegaso Television Corp., Mediaset, Brabur, S.A. de C.V., Grupo Colte, S.A. de C.V., Emilio Braun, Mr. Burillo, Alejandro Orvañanos, Paolo Vasile, Massimo Mussolino, and Mr. Diez-Barroso.

companies, and Emilio Braun, Mr. Burillo's nephew, serving as Executive Vice-President.

A shareholder agreement dated May 1, 2019 (the "2019 Shareholder Agreement"), lists the shareholders of America Teve Holdings, Inc.[4], as of that date as follows:

|  |  |
|---|---|
| Ramon Diez-Barroso | 50.1% |
| Vasallo TV Group, LLC | 34.2% |
| Pegaso Television, Inc. | 11.9% |
| Emilio Braun | 3.8% |

The 2019 Shareholder Agreement identified Mr. Vasallo as CEO, acting without compensation (which could be changed under certain conditions). Mr. Vasallo was permitted to appoint one member of the America Teve Board; Diez-Barroso was entitled to appoint two.

According to the bankruptcy filings, at the time the Chapter 11 Cases were filed Caribevision Holdings was owned 10.33% by Pegaso Television Corp., 73.01% by Ramon Diez-Barroso, and 16.66% by Vasallo TV Group LLC. America-CV Network was owned 100% by Caribevision TV. America-CV Station was owned 50% by Caribevision Holdings, 47% by Okeechobee Television Corp. and 3% by Promisa, Inc.[5] It is not clear who held the interests in Caribevision TV because the wrong Equity Security Holders disclosure was filed in that case.

---

[4] While all parties have referred to this 2019 Shareholder Agreement, no one has clarified what this entity was – was this the entity that supposedly the Romay Parties owned? If so, that makes no sense since no Romay entity is listed as a shareholder. Or, perhaps this was the operating name of what this Opinion has been referring to as the Caribevision Companies.

[5] The Okeechobee and Promisa entities were controlled by the Romay Parties, which, through a settlement incorporated in the Debtors' bankruptcy plans, relinquished their ownership interests in America-CV Station.

However, based on the schedules filed in that case, Pegaso Television, Inc. owned 10.5% interest in Caribevision TV and Vasallo TV Group, LLC held a 16.6% interest. There is nothing on the docket to indicate who owned the balance of the interests in Caribevision TV; presumably that was Ramon Diez-Barroso.

At the time the Chapter 11 Cases were filed, the Debtors operated the largest independent Spanish language television network based in the United States under the brand names "americatevé" and "teveo". At the time of the filing the Debtors operated a total of seven full power television stations in South Florida, Puerto Rico and New York.

The Debtors offered daily live news, entertainment programming and other proprietary content from its state-of-the-art 155,000 square feet facility in Hialeah, Florida, owned by a non-debtor subsidiary, Orly Group, Inc. ("Orly").

The Disclosure Statement described the Debtors' management team at the time (and the proposed management post-confirmation) as Carlos Vasallo  as President and CEO,  Emilio Braun as Executive Vice-President,  Marcell Felipe as General Counsel, Miguel Cossio as Chief Operating Officer, and Jorge Salas as Chief Financial Officer.

On February 26, 2020, the Debtors filed plans of reorganization (collectively, the "Plans"): (i) Chapter 11 Plan Of Reorganization Proposed By America-CV Station Group, Inc. (ECF #125) (the "America-CV Station Plan"), (ii) Chapter 11 Plan Of Reorganization Proposed By Caribevision Holdings, Inc. (ECF #126) (the "Caribevision Holdings Plan"), (iii) Chapter 11 Plan Of Reorganization

Proposed By America-CV Network, LLC (ECF #128) (the "America-CV Network Plan"), and (iv) Chapter 11 Plan Of Reorganization Proposed By Caribevision TV Network, LLC (ECF #127) (the "Caribevision TV Plan"). On March 31, 2020, the Debtors filed the Disclosure Statement.

During the Chapter 11 Cases the parties settled the Romay Litigation and that settlement became an integral part of the four Plans. Part of the settlement was the relinquishment by the various Romay Parties of any interests in any of the Debtors.

The issue that is the center of this dispute is the Plan treatment of the remaining equity holders of the four Debtors. The America-CV Network Plan and the America-CV Station Plan, each wholly owned by the holding companies, provided that the interests of their respective equity holders remain unchanged; the equity holders were therefore unimpaired and had no right to vote.

The Caribevision Holdings Plan and the Caribevision TV Plan provided that on the Effective Date[6] the Equity Interests[7] would be extinguished and New Equity Interests[8] in the respective Reorganized Debtors would be issued as

---

[6] Defined in the Plans as: "subject to the satisfaction or waiver as applicable of the conditions set forth in Article VIII, a date that is not later than ten (10) Business Days after the Confirmation Order becomes a Final Order. Within two (2) Business Days of the Effective Date, the Debtor shall file a notice of the Effective Date with the Bankruptcy Court. Notwithstanding anyting [sic] herein to the contrary, the Debtor reserves the right to waive the requirement of the Confirmation Order becoming a Fianl [sic] Order and shall have the right to proceed with the Effective Date despite the Confirmnation [sic] Order not being a Final Order at such time."

[7] Defined in the Plans as: "the interests of any holder of an equity security of any of the Debtor represented by any issued and outstanding shares of common stock or preferred stock, or any membership interest, partnership interest or other instrument evidencing a present ownership interest in any of the Debtor, including any option, warrant, or right, contractual or otherwise, to acquire any such interest."

[8] Defined in the Plans as: "the new Equity Interests representing in the aggregate 100% of the post-Effective Date Equity Interests in the Debtor that will be issued under the terms of the Plan after cancellation of the pre-Effective Date Equity Interests as provided in the Plan."

follows: (i) Ramon Diez-Barroso - 50.1%, (ii) Vasallo TV Group, LLC – 34.2%, (iii) Pegaso Television Corp. – 11.9%, and (iv) Emilio Braun – 3.8% (the "New Equity Holders").  The  Caribevision TV Plan and the Caribevision Holdings Plan each specifically stated that the equity holders were impaired and were entitled to vote on their respective plans.  The Disclosure Statement also highlighted the right of the Class 3 Equity Holders in Caribevision TV and Caribevision Holdings to vote on the respective plans.  Nonetheless, Ramon Diez-Barroso, Pegaso Television Corp., and Emilio Braun (collectively, the "Pegaso Equity Holders") did not vote on any of the Plans.[9]

All four Plans also required the New Equity Holders to provide, on the Effective Date of the Plans, a collective equity contribution of $500,000, allocated as follows: (i) Ramon Diez-Barroso in the amount of $250,500; (ii) Vasallo TV Group, LLC in the amount of $171,000; (iii) Pegaso Television Corp. in the amount of $59,500; and (iv) Emilio Braun in the amount of $19,000.  The Plans also required the New Equity Holders to commit to a line of credit for $1.6 million, to be provided "on or as soon as reasonably practicable following the Effective Date" of the Plans.

Confirmation of the four Plans was scheduled for Thursday, May 28, 2020 (the "Confirmation Date").  On about May 13 or 14, 2020, approximately two weeks prior to the Confirmation Date, Marcell Felipe, outside counsel to the Debtors, as well as Mr. Vasallo's personal attorney, apparently informed Emilio Braun that the documents relating to the line of credit and the equity

---

[9] It is not clear if Mr. Vasallo voted on any of the Plans.

contributions needed to be sent to Paul Battista, the Debtors' bankruptcy counsel, by Friday, May 22, 2020. The Pegaso Equity Holders did not get either the funds or the line of credit documents to Mr. Battista by May 22, although the Pegaso Equity Holders funded $329,000 to the Debtors' bank account on May 26, 2020[10] and a second $329,000 to the trust account of Debtors' counsel on or about May 27, 2020. Both transactions cleared prior to the Confirmation Date. However, by then, the Vasallo TV Group had funded the entire $500,000 equity contribution and apparently executed all documents necessary to fund the full line of credit.

On May 26, 2020, two days before the Confirmation Date, the Debtors filed their *Emergency Motion to Make Non-Material Modifications to Debtors' Plans of Reorganization Dated February 26, 2020* (ECF #248) (the "Motion to Modify") seeking to modify the Plans such that, because Vasallo TV Group was now providing the full equity contribution and all the exit financing, Vasallo TV Group would be given all of the new equity in Caribevision TV and Caribevision Holdings (the "Modification").

The Motion to Modify was heard by the Bankruptcy Court[11] on the Confirmation Date. The Modification removed the Pegaso Equity Holders from the Plan provisions related to the source of the Equity Contribution and the exit financing and, most significantly issuance of the New Equity Interests under the

---

[10] Monday, May 25, 2020 was Memorial Day and the banks (and the Court) were closed.
[11] The bankruptcy judge who presided over the Chapter 11 Cases retired and, on remand, these matters were assigned to a new judge. To differentiate rulings, the original judge will be referred to as the "Bankruptcy Court", while the rulings of this judge will be referred to as "the Court".

Plans. Under the Modification, Vasallo TV Group, LLC would provide the entire $500,000 equity contribution, become the sole exit lender, and obtain 100% of the New Equity Interests in the Reorganized Debtors.

The Pegaso Equity Holders did not receive a copy of the Motion to Modify, nor apparently did any of them attend the confirmation hearing.[12] As the Eleventh Circuit held, the Pegaso Equity Holders did not know what was going on.

> The emergency motion was not served on the Pegaso Equity Holders, who had not yet entered an appearance in the bankruptcy court. The record reflects that they knew of (and privately objected to the idea of) a contemplated modification, but there is no evidence that they knew the motion was filed or were aware of its specific terms. To the contrary, in a series of emails exchanged between the parties in the hours leading up to the confirmation hearing, the debtors assured the Pegaso Equity Holders that they would "try to resolve the situation."
>
> To that end, the debtors (again, controlled by Vasallo) appeared to work with the Pegaso Equity Holders to facilitate the transfer of their portion of the equity contribution and execution of the line of credit. The debtors continued to coordinate the wire transfer and line of credit from the Pegaso Equity Holders even after Vasallo had covered the entire equity contribution himself and even after the debtors had filed the emergency motion requesting modification of the plans in favor of Vasallo.

*In re America-CV Station Group, Inc.,* 56 F.4th 1302, 1306-07 (11th Cir. 2023).

Notwithstanding that the Modification stripped three of the four equity holders of Caribevision TV and Caribevision Network of their right to receive new equity in exchange for their aliquot share of the Equity Contribution and exit financing, the Motion to Modify, as well as the Debtors' counsel's presentation

---

[12] The confirmation hearing took place in the early days of the pandemic and the entire hearing was conducted telephonically.

to the Court, characterized the Modification as non-material. While Debtors' counsel correctly noted that the Modification "do[es] not impact or affect creditors or the treatment of creditors in any way whatsoever,"[13] there is no question, and the Eleventh Circuit found, that the Modification materially and adversely affected the interests of the Pegaso Equity Holders.

On June 2, 2020, the Bankruptcy Court entered its *Order Granting Emergency Motion to Make Non-Material Modifications to Debtors' Plans of Reorganization Dated February 26, 2020* (ECF #271) (the "Modification Order") and on June 3, 2020, entered its order confirming the Plans as modified  (ECF #272) (the "Confirmation Order").

Three days later, on June 5, 2020, the Pegaso Equity Holders filed a Motion to Reconsider.[14]  On June 9, 2020, before the Motion to Reconsider was heard, the Reorganized Debtors filed the *Notice of Occurrence of Effective Date of Debtors' Plans of Reorganization Dated February 26, 2020, as Modified* (ECF #280). In response, on June 10, 2020, the Pegaso Equity Holders filed a Motion to Strike Effective Date.[15]

---

[13] Tr. of 5/28/2020 Hearing (ECF #274) 22:17-25-23:1.

[14] *Expedited Motion (1) to Reconsider Confirmation Order, and Specifically to Strike those Modifications to the Plans Set Forth in Debtors' Emergency Motion to Make Non-Material Modifications to Debtors' Plan of Reorganization Dated February 26, 2020; (2) to Strike Order [D.E. 271] Granting Debtors' Emergency Motion to Make Non-Material Modifications to Debtors' Plan of Reorganization Dated February 26, 2020; and (3) to Deny Debtors' Emergency Motion to Make Non-Material Modifications to Debtors' Plan of Reorganization Dated February 26, 2020*  (ECF #275) (the "Motion to Reconsider").

[15] *Motion to (1) Strike Notice of Occurrence of Effective Date of Debtors' Plans of Reorganization Dated February 26, 2020, as Modified; and (2) Prevent Debtors from Moving to Substantial Consummation Until After the Court Rules on the Equity Interest Holders' Expedited Motion [D.E. 275], Set for Hearing on June 17, 2020* (ECF #284) (the "Motion to Strike Effective Date").

On July 16, 2020, the Bankruptcy Court denied the Motion to Reconsider and the Motion to Strike Effective Date, and entered its Order Denying Reconsideration[16]. The Bankruptcy Court held that (i) the Pegaso Equity Holders did not present any newly discovered evidence and there was no manifest error of law or fact warranting reconsideration of granting the Modification; (ii) the Pegaso Equity Holders were already impaired under the Plans prior to any modification and were already deemed to have rejected such Plans and therefore did not require additional disclosure or an opportunity to vote; and (iii) there was due notice of the scheduled confirmation hearing.

On July 27, 2020, the Pegaso Equity Holders filed their Notice of Appeal to the District Court (ECF #311) appealing (i) the Order Denying Reconsideration; (ii) the Modification Order, and (iii) the Confirmation Order.[17] On September 30, 2021, the District Court affirmed the Bankruptcy Court's orders (the "District Court Order")[18] agreeing with the Bankruptcy Court that the Pegaso Equity Holders did not have standing to object to the Debtors' Modification of the Plans because the Pegaso Equity Holders did not vote on, or accept, the originally filed Plans.

Thereafter, the Pegaso Equity Holders appealed to the Eleventh Circuit Court of Appeals.

---

[16] *Memorandum Opinion and Order Denying (A) Expedited Motion to (I) Reconsider the Confirmation Order, (II) Strike Order [DE. 271] and (III) Deny Emergency Motion to Make Non-Material Modifications to Debtors' Plans and (B) Motion to (1) Strike Notice of Occurrence of Effective Date and (2) to Prevent Debtors from Moving to Substantial Consummation of Plans* (ECF #308) (the "Order Denying Reconsideration").
[17] The District Court case number is 20-cv-23120-DPG. The Court cites entries on the District Court docket as "District Court ECF #".
[18] *Order* (District Court ECF #36).

**The Eleventh Circuit Ruling**

On January 5, 2023, the Eleventh Circuit entered its opinion (i) reversing the Modification Order, (ii) reversing in part the Confirmation Order to the extent it adopted the Modification, and (iii) remanded to the Bankruptcy Court to "fashion an equitable remedy consistent with this opinion."

In addition to its ultimate holding reversing that portion of the Confirmation Order that confirmed the Modification, the Eleventh Circuit also made some factual findings based on the record before it on appeal. The Eleventh Circuit found that the Modification "adversely and materially impacted" the Pegaso Equity Holders. The Eleventh Circuit also held that the Pegaso Equity Holders did not receive adequate notice of the Modification, noting that first, Emilio Braun being told modification was being contemplated was not the same as getting formal notice through "the disclosures required by the Bankruptcy Code", and second, that "debtor's counsel, after filing the motion to modify, falsely assured the Pegaso Equity Holders that he wanted to be helpful and would try to resolve the situation – all while moving full speed ahead on the modification in the bankruptcy court."

> The Pegaso Equity Holders were given no reason to believe they would lose their equity interests at the confirmation hearing. After all, the debtors had assured them that they were seeking a solution and had actively worked to coordinate the wire transfer in the days before the hearing. The Pegaso Equity Holders had invested over $65 million into the companies and held equity in the debtors since their inception. Braun attested that he was "unaware until after the Confirmation Hearing" that his "equity interests in the Debtors would be formally extinguished." Braun and the rest of the Pegaso Equity Holders did not have reason to expect to lose their equity in a bankruptcy proceeding that focused on addressing debts owed to third parties.

56 F.4th at 1307.

The Eleventh Circuit reversed the Bankruptcy Court's holding that the Pegaso Equity Holders were not entitled to vote on the Modification because they had not voted on the Plans. The Eleventh Circuit rejected the Bankruptcy Court's interpretation of Bankruptcy Rule 3019(a),[19] holding that the plain language of Rule 3019 is "clear that if a modification materially and adversely changes the treatment of a claim or interest holder who has not accepted the modification in writing, then that claim or interest holder is entitled to a new disclosure statement and resolicitation of votes." *Id.* at 1311. The Pegaso Equity Holders were entitled to vote notwithstanding that they had not voted on the prior Plans.

Because the modifications to the Caribevision TV Plan and to the Caribevision Holdings Plan were material and adversely impacted property interests of the Pegaso Equity Holders, the Eleventh Circuit held that when the Motion to Modify was filed, the Pegaso Equity Holders had the right to an amended disclosure statement and the opportunity to vote on the Modification, and, in connection with that process, object to the Modification.

The Eleventh Circuit also held that the Bankruptcy Court improperly allowed cramdown, or as Debtor's counsel characterized it at the confirmation hearing, "technical cramdown", of the Pegaso Equity Holders. The Bankruptcy

---

[19] Fed. R. Bankr. P. 3019(a) provides: "If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that the proposed modification does not adversely change the treatment of the claim of any creditor or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan."

Court accepted the argument that, because the Caribevision TV and Caribevision Holdings equity holders' interests were being extinguished, they were "deemed not to have accepted a plan." But the Eleventh Circuit held that the Bankruptcy Court failed to recognize that the old equity holders were receiving property on account of those interests – the exclusive right, collectively, to obtain new equity based on the Equity Contribution and exit financing. Moreover, as the Eleventh Circuit noted, the Caribevision Holdings Plan and the Caribevision TV Plan each acknowledged that the respective equity holders had the right to vote. "[T]he plans implicitly concede that the Pegaso Equity Holders were entitled to receive or retain property." *Id.* at 1310-11. And therefore 11 U.S.C. §1126(g) did not apply.

The Eleventh Circuit also held that because the Caribevision TV and Caribevision Holdings Plans as modified provided different treatment to different members of the Class 3 Equity Holders (that is, giving only the Vasallo Group, only one of the members of Class 3, the exclusive right to the New Equity Interests), in violation of 11 U.S.C. §1123(a)(4), and therefore the Plans, as modified, were not confirmable.

Finally, the Eleventh Circuit held that even though no one objected to the Motion to Modify, the Bankruptcy Court had an independent duty, separate from any objections lodged, to determine whether the Plans, as modified, satisfied all the requirements for confirmation. The Eleventh Circuit held that Bankruptcy Court did not exercise that independent duty.

For all of these reasons, the Eleventh Circuit ruled as it did.

**<u>Is There a Remedy?</u>**

The Eleventh Circuit remanded the case to this Court to fashion a remedy. The Court set this matter for status conference on February 10, 2023, and asked the parties to submit proposals on how to address the remedy remand. Ultimately the parties determined that the Court should allow time for discovery and then submission of argument by the parties on how, if at all, this Court could fashion a remedy. The parties further agreed that, after written submission, the Court would determine whether any evidentiary hearing would be required.

At the first of, unfortunately, several discovery dispute hearings, the Court ordered that the relevant time frame for discovery would be limited to after the date that the Plans and disclosure statement were originally filed (February of 2020). The Court determined that, whatever alleged disputes there were between the equity shareholders pre-bankruptcy, or even during the bankruptcy case, the parties had resolved to move forward under a certain framework, which framework was reflected in the Plans. Thus past history of past insults was not relevant.

The parties have submitted their written arguments on how to address the Eleventh Circuit's ruling. The parties agree that, for purposes of reviewing the submissions, the Court should apply the same standards that apply to motions for summary judgment under Fed. R. Civ. P. 56, made applicable to these proceedings pursuant to Fed. R. Bankr. P. 7056. Consequently, the facts upon which these rulings are based consist of the findings of fact made by the Eleventh

Circuit, those facts that do not appear to be in dispute, recitations in documents submitted by the Debtors during the course of the bankruptcy cases, and those which were unrebutted by either party in connection with factual submissions in support of the competing memoranda.[20]

The Reorganized Debtors, joined by the Vasallo Group[21], argue that (a) this Court does not have subject matter jurisdiction to adjudicate what is a dispute between non-debtor parties; (b) resolution is barred by equitable mootness because the Plans were confirmed over three years ago and the Pegaso Equity Holders never sought a stay pending their appeals; (c) the Plans were not severable and therefore the Eleventh Circuit's ruling directs a "non-sensical dilemma that is not authorized under the Bankruptcy Code and applicable law"; (d) in what appears to be the opposite of the Reorganized Debtors' first argument, the Plans are contracts between the Reorganized Debtors and their creditors and following the Eleventh Circuit's direction would require those contracts to be rewritten, which is a violation of Florida law; (e) even if the Eleventh Circuit could partially reverse part of the Confirmation Order, it did not reverse that portion that includes releases by the Pegaso Equity Holders of Mr. Vasallo and the Vasallo TV Group, LLC; and (f) finally, the Vasallo Group justifiably relied in good

---

[20] The Court has referred to the depositions submitted. The Pegaso Equity Holders objected to almost all of the Vasallo Declaration. The Court sustained all of those objections and has considered in this ruling only what appear to be basic historical facts. Where the parties dispute the facts recited in this ruling, those disputed facts are noted.

[21] The vast majority of the Reorganized Debtors' arguments are arguments that focus on what appear should be concerns raised by the Vasallo Group, rather than the Reorganized Debtors. Nothing submitted addresses how, if at all, the Reorganized Debtors would be impacted by the Eleventh Circuit's mandate or any remedy fashioned by this Court, other than an observation that all the estate property revested in the Reorganized Debtors on the Effective Date.

faith on the finality of the Confirmation Order. Additionally, if there is any type of adjustment arising from a remedy, the Vasallo Group argues it is entitled to "adjustments" based on all the money that the Vasallo Group has put into the Reorganized Debtors since the Confirmation Date.

The Pegaso Equity Holders argue that the Eleventh Circuit has ruled; just give them their stock as set forth the in the original unmodified Plans. They also argue that the Vasallo Group did not act in good faith or reasonably rely on the finality of the Confirmation Order, and due to unclean hands are not entitled to any adjustment of any kind. All that is needed is an order clarifying or modifying the Confirmation Order.

None of these arguments is correct.

## ANALYSIS

## The Court Has Subject Matter Jurisdiction

The Reorganized Debtors and the Vasallo Group alternate between arguing that this is just a dispute between shareholders and therefore a matter over which the Court does not have subject matter jurisdiction, and that the fashioning of any remedy would be a complete undoing of the Plans and the underlying reorganization of the Debtors and the resolution of their debts. The Reorganized Debtors and the Vasallo Group have previously argued that this dispute is just a shareholder dispute[22] but the Court assumes they have not

---

[22] *See Reorganized Debtors' Response and Objection to Former Equity Interest Holders' (A) Expedited Motion To (I) Reconsider the Confirmation Order, (II) Strike Order [DE. 271] and (III) Deny Emergency Motion to Make Non-Material Modifications to Debtors' Plans and (B) Motion to (1) Strike Notice of Occurrence of Effective Date and (2) to Prevent Debtors from Moving to Substantial Consummation of Plans* 3-4, (ECF #300); *Reorganized Debtors' Request for Relief in Response to the Eleventh Circuit Opinion* ¶¶58-61, (ECF #475).

previously argued lack of subject matter jurisdiction or that would have been addressed by the District Court, and certainly the Eleventh Circuit, which considers subject matter jurisdiction in every case that it decides.  Of course, lack of subject matter jurisdiction can be raised at any time. *See Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).

Although the shareholder dispute lies at the heart of the Eleventh Circuit ruling, the basis of this Court's subject matter jurisdiction is that the issue that has been litigated, and that the Eleventh Circuit ruled upon, is whether the Debtors' Plans, as modified by the Modification, were confirmable under the Bankruptcy Code, which, the Eleventh Circuit ruled, they were not.

Confirmation of a bankruptcy plan is a core proceeding. 28 U.S.C. §157(b)(2)(L).  As the Eleventh Circuit observed in *In re Toledo*, 170 F.3d 1340 (11th Cir. 1999) –

> Although whether something is a core proceeding is analytically separate from whether there is jurisdiction, by definition all core proceedings are within the bankruptcy court's jurisdiction. Core proceedings are defined in 28 U.S.C. § 157(b)(1) as "proceedings arising under title 11, or arising in a case under title 11," which is a subset of the cases over which jurisdiction is granted in § 1334(b).

*Id.* at 1345 n.6.  In addition, "[w]hen, in a Chapter 11 case, a bankruptcy court issues an order confirming a reorganization plan, that court retains post-confirmation jurisdiction to complete any action pertinent to the plan." *Alderwoods Group, Inc. v. Garcia*, 682 F.3d 958, 969 (11th Cir. 2012).

Because the matter before the Court is all about the Confirmation Order and confirmability of the Plans as modified, reliance by the Reorganized Debtors'

and the Vasallo Group on the *Pacor*[23] test is misplaced. This Court does have subject matter jurisdiction to enter orders on remand in accordance with the Eleventh Circuit's ruling[24].

## **Resolution Is Not Barred by the Equitable Mootness Doctrine**

The Reorganized Debtors and the Vasallo Group argue that resolution is impossible due to equitable mootness. Both the District Court and the Eleventh Circuit have held otherwise.

Equitable mootness is a court-made remedy that "provides that reviewing courts will, under certain circumstances, reject bankruptcy appeals if rulings have gone into effect and would be extremely burdensome, especially to non-parties, to undo." *Bennett v. Jefferson Cnty., Alabama*, 899 F.3d 1240, 1247 (11th Cir. 2018).

The District Court denied the Reorganized Debtors' motion to dismiss the initial appeal on grounds of equitable mootness holding that "it is possible to grant effective judicial relief."[25]

The Eleventh Circuit addressed equitable mootness only to note the District Court's ruling and the failure of the Reorganized Debtors and the Vasallo Group to appeal the District Court's ruling on the motion to dismiss or to "raise

---

[23] *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984) (articulating a test for determining whether a civil proceeding is "related to" bankruptcy for purposes of subject matter jurisdiction).

[24] The Pegaso Equity Holders also pointed to the retention of jurisdiction provision in the Confirmation Order. The retention of jurisdiction provisions are found in Article XI of each Plan and in paragraph 26 of the Confirmation Order. However, no specific retention of jurisdiction can create subject matter jurisdiction over a dispute if subject matter jurisdiction does not exist.

[25] *Paperless Order Denying Appellees' Motion to Dismiss Appeal as Equitably Moot* (District Court ECF #31).

equitable mootness in their briefings." Thus, the Eleventh Circuit assumed the appeal is not equitably moot.

Having abandoned the equitable mootness argument on appeal, the Vasallo Group and Reorganized Debtors may not try to resurrect the argument here. The Eleventh Circuit has ruled on this issue, and for purposes of this case, that argument is closed.

**<u>Partial Reversal of a Confirmation Order Is Possible</u>**

The Reorganized Debtors argue that because there is no severability provision in the Plans, this Court cannot fashion any remedy, that partial reversal of a confirmation order is a violation of the Bankruptcy Code, and that the Eleventh Circuit opinion "creates a non-sensical dilemma." The Reorganized Debtors are wrong.

Partial reversal of a confirmation order is not a violation of the Bankruptcy Code nor impossible. In fact, there have been several cases in which an appellate court has reversed a confirmation order in part. *See e.g., Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.),* 2018 WL 5113124 (N.D. Tex. 2018), *aff'd sub nom. Matter of Thru, Inc.,* 782 Fed. Appx. 339 (5th Cir. 2019) (reversing the bankruptcy court's approval of the plans' injunction and exculpation provisions, and remanding case to the bankruptcy court with instructions to strike specific paragraphs of the plans concerning the improper releases of non-debtor third parties); *Matter of MPM Silicones, L.L.C.,* 874 F.3d 787, 805 (2d Cir. 2017) (reversing the order affirming confirmation in part and remanding to the bankruptcy court only "to re-evaluate the interest to be received on the

replacement notes held by the Senior-Lien Notes holders."); *In re AOV Indus., Inc.*, 792 F.2d 1140, 1141 (D.C. Cir. 1986) (refusing to reverse the confirmation entirely because "less drastic action is available" and instead reversing confirmation in part); *In re Pac. Lumber Co.*, 584 F.3d 229, 236 (5th Cir. 2009) (reversing confirmation of plan in part with respect to the non-debtor release provisions).

If the lack of a severability provision meant partial reversal was a legal impossibility, that would mean the entire confirmation was undone and the only remedy is that the Reorganized Debtors become Debtors again, as occurred in the *LaSalle* bankruptcy case after the United States Supreme Court reversed and remanded the confirmed bankruptcy plan. *See 203 N. LaSalle St. P'ship v. Bank of Am. Nat. Ass'n,* 1999 WL 1206619, at *1 (N.D. Ill. 1999) ("On remand, Bankruptcy Judge Wedoff entered orders that: (1) vacated the order confirming the Plan; (2) restored the Debtor to the status of debtor in possession; (3) voided the note made by the Debtor in favor of the Bank pursuant to the Plan and ordered the Bank to return with interest any payments made under it; (4) ordered a revaluation of the Bank's secured claim; and (5) denied the Debtor's motion for an extension of the period of exclusivity."); *In re 203 N. LaSalle St. P'ship*, 246 B.R. 325, 328 (Bankr. N.D. Ill. 2000) ("Following the remand of the debtor's case, this court issued an order on September 15, 1999 designed, insofar as possible, to place the parties in the positions that they occupied prior to confirmation. The order also terminated the debtor's exclusive right to propose a plan. Thereafter, the Bank and the debtor indicated an intent to present competing plans.").

However, regardless of whether there was a severability provision in the Plans[26], the Eleventh Circuit has already partially reversed the Confirmation Order. That ruling is the law of the case. The Confirmation Order has been vacated with respect to the treatment of the Class 3 Equity Holders of Caribevision TV and Caribevision Holdings. The doctrine of law of the case "is a rule of practice under which a rule of law enunciated by a federal court not only establishes a precedent for subsequent cases under the doctrine of stare decisis, but [also] establishes the law which other courts owing obedience to it *must*, and which it itself will, normally, apply to the same issues in subsequent proceedings in the same case. . . . While the law of the case does not bar litigation of issues which might have been decided but were not, ... it does require a court to follow what has been decided explicitly, as well as by necessary implication, in an earlier proceeding." *In re All Am. Semiconductor, Inc.*, 427 B.R. 559, 565–66 (Bankr. S.D. Fla. 2010) (internal citations and quotations omitted).[27]

Fortunately for all, the Modification did not, as Debtors' counsel correctly stated at the confirmation hearing, impact the creditors. Thus, partial reversal leaves intact the balance of the Plans.

---

[26] It is not clear whether, in the cited cases, there were or were not severability provisions in the plans.

[27] The Reorganized Debtors correctly point out that the law of the case does not bar consideration of facts that were not before the higher tribunal. For purposes of this ruling, the limited factual findings made by the Eleventh Circuit are supported by the record the parties have presented to this Court for review and consideration. Moreover, the Eleventh Circuit's holdings regarding the correct interpretation of Fed. R. Bankr. P. 3019 as well as the undisputed requirements for plan treatment set forth in 11 U.S.C. §§1123(a)(4) and 1126(g) are legal rulings that have been conclusively decided.

**The Contracts With the Creditors Have Been Fulfilled**

As the Reorganized Debtors point out, bankruptcy plans are contracts between debtors and their creditors.  The Reorganized Debtors argue that no equitable remedy can be fashioned because it would adversely impact those creditor contracts, and that "substantial changes have occurred" which would be adversely impacted by fashioning any remedy. However, nothing has been submitted that would suggest that any of this is the case.

According to the Reorganized Debtors, all unsecured creditors have been paid.  The Reorganized Debtors did not have any secured creditors whose debts were treated in the Plans. The outstanding obligations to the unsecured creditors under the Plans was paid through refinancing of the secured debt of Orly.  Thus, all bankruptcy debt, other than the disputed claim of the Romay Parties, which was resolved by confirmation that included the settlement with the Romay Parties, has been resolved.

Neither the Vasallo Group nor the Reorganized Debtors have identified any "substantial changes" that would impact the Reorganized Debtors by a remedy consistent with the Eleventh Circuit's remand. The only substantial changes the memoranda point to is Mr. Vasallo using his "personal wealth" to secure funding[28], some dispute regarding an antenna, and who owns it and who paid

---

[28] Before the Effective Date, the Debtor America-CV Network  was co-guarantor of a debt owed by Orly to Sabadell Bank, which debt was secured by the building in which the Debtors, and now the Reorganized Debtors, operate. That debt is no longer outstanding. Mr. Vasallo arranged to pay off the Sabadell Bank debt with a loan from the lending institution with which he has a relationship, ABANCA USA, and used some of those funds to pay off the unsecured creditors. And ultimately, after the Eleventh Circuit ruled, Mr. Vasallo, through one of his companies, bought the Orly property at an arguably below-market price, paid off the ABANCA loan, and his personal guarantee was released.

for it, and Mr. Vasallo's claim that he has not taken any salary[29]. Those are issues personal to Mr. Vasallo and the Vasallo Group.

**The Releases**

Next the Reorganized Debtors and the Vasallo Group argue that no equitable remedy can be fashioned by the Court because the Pegaso Equity Holders "have fully and completely released the Vasallo Group from any and all claims and causes of action occurring prior to the Effective Date of the Plans," which, according to the Reorganized Debtors, includes the Modification, since that took place before the Effective Date.[30]

The Reorganized Debtors and the Vasallo Group argue, correctly (but inconsistent with its argument that the Eleventh Circuit's ruling would require this Court to write a completely new plan) that the Eleventh Circuit did not reverse any portion of the Plans other than the portions addressed in the Modification, and that those sections, including the release provision, are "in full force and effect." Because, they argue, the relief sought by the Pegaso Equity Holders is against the Vasallo Group, no remedy is available since any claims have all been released, and any attempt to remedy the "Modifications to the Plans complained of" would require this Court to "ignore" the release provisions. Once again, the Reorganized Debtors and the Vasallo Group are wrong.

---

[29] The Pegaso Equity Holders point out that in the 2019 Shareholder Agreement Mr. Vasallo agreed he wouldn't take any salary.

[30] The release provisions are found in Article X.G of each Plan and in paragraph 13 of the Confirmation Order. The Releases are the same in  the Plans and the Confirmation Order.

The Pegaso Equity Holders correctly point out that the relief they are seeking is not against the Vasallo Group, but rather directed to the Reorganized Debtors, who are not included in the releases, or is outside the releases. The Pegaso Equity Holders want this Court to direct the Reorganized Debtors to issue the equity to which they would have been entitled had the Modification not been filed and approved.

Equally correct is the Pegaso Equity Holders' argument that the releases specifically "*provided, however*, that nothing herein or in the Plan shall be interpreted as a release of the Released Parties' or Reorganized Debtors' rights or obligations under the Plan." While the Vasallo Group might have to relinquish stock to which, under the original Plans it was not entitled, incidental to any relief this Court may fashion so that the Reorganized Debtors can reissue the stock as originally structured, such relief is not barred. The relief is both directed to the Reorganized Debtors, and is part of the obligations of the Reorganized Debtors and the Vasallo Group under the Plans and thus, not released.

### Good Faith Reliance Requires Good Faith

The Reorganized Debtors and the Vasallo Group claim that the Vasallo Group relied in good faith on the finality of the Confirmation Order, that the Pegaso Equity Holders "[allowed] and [encouraged] the Vasallo Group to rely on the finality of the Confirmation Order, which reliance would be to its detriment if this Court were to fashion an equitable remedy after the fact."

The Reorganized Debtors argue that "[o]ne of the principal considerations that needs to be evaluated . . . is whether 'the [Pegaso Equity Holders] pursued

with diligence all available remedies to obtain a stay of execution of the objectionable order. . .'".  It is not disputed that the Pegaso Equity Holders have never sought a stay pending appeal because the Pegaso Equity Holders have repeatedly stated that they did not wish to interfere with any portion of the Plans other than the Modification. However, from *two days* after the Confirmation Date, the Pegaso Equity Holders have done everything possible to undo the Modification, beginning with the June 5, 2020 Motion to Reconsider through the successful appeal to the Eleventh Circuit. "That there might be adverse consequences to [the losing party in an appeal] is not only a natural result of any ordinary appeal—one side goes away disappointed—but adverse appellate consequences were foreseeable to them." *Pac. Lumber Co.*, 584 F.3d at 244. Thus any assertion that the Vasallo Group was "allowed" and "encouraged" to take any action that didn't preserve its own interests during this dispute is, at best, disingenuous.

Moreover, the undisputed facts are clear that Mr. Vasallo did not act in good faith.  "A party seeking equitable relief is required to have acted in good faith in connection with the matters as to which she seeks such relief, often stated in shorthand as the requirement of 'clean hands.'" *In re Skolnick*, 363 B.R. 626, 627–28 (Bankr. S.D. Fla. 2007).

> Equity imperatively demands of suitors in courts fair dealing and righteous conduct with reference to the matters concerning which they seek relief. He who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice, or unfairness will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly "within the law." Misconduct which will bar relief in a court of equity need not

necessarily be of such a nature as to be punishable as a crime or to constitute the basis of a legal action. Under this maxim, any willful act in regard to the matter in litigation, which would be condemned and pronounced wrongful by honest and fair minded men, will be sufficient to make the hands of the applicant unclean. Both courts and text-writers have repeatedly spoken upon this subject in no uncertain language.

*Id.* at 628 (citing Story's *Equity Jurisprudence* (14th Ed.), vol. 1, § 99).

The Court cannot ignore the undisputed circumstances preceding the filing of the Motion to Modify or Mr. Vasallo's stated intent with respect to the true motivations surrounding the Modification, all of which completely undercut any claim to good faith. The nature of the disputes between the Vasallo Group on the one hand, and the Pegaso Equity Holders on the other, leading up to the Modification, according to Mr. Vasallo's deposition testimony, actually center on two things – first, a concern, well-founded or not, that the Pegaso Equity Holders would not fund the Equity Contribution or sign the documents necessary for the line of credit[31] by the Effective Date, and second, Mr. Vasallo's concerns that his position as CEO of the Reorganized Debtors was going to be put in jeopardy. Indeed, there is no question that this second point, Mr. Vasallo's potential loss of control[32], was Mr. Vasallo's driving concern - "I know this is going to be a

---

[31] The record is not clear what documents were being discussed in draft during the May 2020 time period. It appears some kind of signature page may have been provided at some point prior to the Confirmation Date. However, the Court is not aware of any circumstance in which loan documents necessary to the effectiveness of a plan must be delivered prior to confirmation in order to prove feasibility. Moreover, as already noted, the Plans only required that the line of credit, and presumably the required documents, be available on the Effective Date. It is not clear from the record if any such line of credit was ever extended to the Reorganized Debtors.

[32] Mr. Vasallo was a minority shareholder prior to the Effective Date of the Plans, and under the original Plans he would have continued to be a minority shareholder. Thus, his ability to maintain a position was always dependent on the applicable state laws, corporate governing documents, and any shareholder agreements.

nightmare if they have the opportunity to put the money on time."[33] In the Vasallo Declaration, most of which the Court has stricken, Mr. Vasallo makes clear that his primary concern during this time period was that Mr. Burillo and the Pegaso Equity Holders wanted to "terminate me and all members of senior management of the Debtors who reported to me, and then attempt to take control of my equity interests in the Debtors."[34] So Mr. Vasallo, using his position as CEO, took steps to take control of the Pegaso Equity Holders' equity interests instead.

The Plans unequivocally required that the Equity Contribution would be made, and the line of credit would be extended, as of the Effective Date.[35] Reasonably, Debtors' counsel requested funds prior to the confirmation hearing[36] so that the Plan Proponents' Certificate could certify what funds were

---

[33] Vasallo Dep. 53:6-8 (ECF #469).

[34] (ECF #467-1 at ¶45). The Vasallo Declaration illustrates that Mr. Vasallo views himself as the savior of the business since he became involved. The extent to which that is true is difficult to assess, nor is it relevant to this decision. There do appear to be at least a few inaccuracies in Mr. Vasallo's testimony. For example, in his deposition and his declaration, Mr. Vasallo speaks about his financial contributions to the Debtors during the bankruptcy case. However, in his deposition testimony, Jorge Salas, the CFO of America-CV Network, testified that none of the Vasallo Group put any money into the business during the bankruptcy, or at any time after 2016 or 2017. Salas Dep. 49:2-13 (ECF #468). The only money put in to the Debtors during the bankruptcy was by the Pegaso Equity Holders. In his deposition Mr. Vasallo also testified that he and Mr. Burillo had been close friends until this dispute, and in fact, Mr. Vasallo stayed in Mr. Burillo's apartment in Madrid while Mr. Vasallo recuperated from COVID. However, Mr. Burillo testified that he did not know Mr. Vasallo very well and only agreed to allow Mr. Vasallo to stay in his Madrid apartment because Mr. Braun asked him to.

[35] The Modification did not modify those provisions of the Plans, so even after the Modification was approved by the Bankruptcy Court, the deadline for funding or availability of funding was still the Effective Date, not the Confirmation Date.

[36] There is no indication whether Mr. Battista also informed Mr. Braun and the others in the Pegaso Equity Holders group of the May 22 deadline, or whether all the communications on the funding issue were delivered through Mr. Felipe.

on hand for confirmation.[37]   While there is plenty of dispute regarding what happened between May 13 or May 14, when Mr. Felipe testified he told Mr. Braun about the May 22 deadline, and when the Pegaso Equity Holders wired their share of the Equity Contribution, there is no dispute that the Pegaso Equity Holders wired the money so it was received May 26 in the morning (which deadline Mr. Felipe initially told Mr. Braun was okay, and then, supposedly corrected himself later). Thus, the Pegaso Equity Holders provided the funds two business days in advance of the Confirmation Date.  The Reorganized Debtors argue that the Pegaso Equity Holders were told the money needed to be in Debtors' counsel's trust account not the Debtors' DIP account, so the Pegaso Equity Holders re-sent the money that same day to Mr. Battista's trust account.[38]

In sum, the Debtors filed the Motion to Modify and represented to the Bankruptcy Court that first, the Modification was "non-material", which the Eleventh Circuit held is not true, and second, that the Modification was necessary because the Pegaso Equity Holders did not meet the *required* deadline, which also was not true. Moreover, based on Mr. Vasallo's own testimony, the Modification was filed at the direction of Mr. Vasallo, using his position as CEO to dictate a course designed to benefit him personally.

---

[37] While it is always better for debtor's counsel to be able to certify that the funds necessary for the effective date be either in counsel's trust account or the debtor's DIP account(s), this is not a condition to confirmation, although it raises issues regarding feasibility.

[38] There was nothing in the Plans, nothing in the Bankruptcy Code, and nothing in this Court's local rules that require that money could only be wired into counsel's trust account.

Accordingly, the Court unequivocally rejects the good faith reliance argument.

## **The Next Steps**

The Eleventh Circuit ruled that the Plans as modified were not confirmable. The Eleventh Circuit could have reversed the Confirmation Order *in toto*, and, if that were the case, the remedy would be "simple". Like Judge Wedoff in the *LaSalle* case, the Confirmation Order would be vacated, the estate reopened, probably a chapter 11 trustee appointed due to the current relationship between the shareholders, and the case would proceed to a new plan or conversion.

But, the Eleventh Circuit did not reverse the entire Confirmation Order, because, without the fatal flaw of the Modification, the Plans were confirmable. As Debtor's counsel pointed out to the Bankruptcy Court – the Modification would not impact any creditors. Thus, the situation at the Eleventh Circuit was made easier. The Eleventh Circuit reversed that part of the Confirmation Order that approved the Modification.  The balance of the Confirmation Order, and the balance of the Plans (everything other than the issuance of new equity) was left intact by the Eleventh Circuit ruling, and that ruling was not appealed. And, because the Modification only dealt with the treatment of the Class 3 Equity Holders of Caribevision TV and Caribevision Holdings, as well as funding commitments required of the New Equity Holders,  the reversal of the Modification Order and partial reversal of the Confirmation Order,  as the

Reorganized Debtors point out, leave intact all other aspects of the Plans as originally filed.

Assuming that the Pegaso Equity Holders could have and would have performed their obligations under the Plans, they are entitled to receive the interests that should have been allocated to them.[39] There is no dispute that the Pegaso Equity Holders funded their share of the equity contribution well in advance of the Confirmation Date. Debtors' counsel reasonably requested the funds prior to the Confirmation Date so that the Certificate of Plan Proponent could be filed, however, there is no reason why, knowing that the funding was coming (as evidenced by the exchange of emails on May 25)[40], that counsel could not have filed a motion to file the Plan Proponent Certificate one day late.[41] Indeed, the Debtors filed several motions to extend certain confirmation related deadlines – just not this one.

Moreover, the Motion to Modify was filed at 8:06 p.m. on May 26, 2020, several hours after the Pegaso Equity Holders had wired the necessary funds, albeit to the Debtors' bank account, rather than counsel's bank account.

While there was no reason that the actual exit loan financing documents needed to be in hand prior to the Confirmation Date, those documents and that commitment had to be in hand by the Effective Date. Of course, the Pegaso

---

[39] The Court notes that none of the Plans addressed what would happen if less than all of the Class 3 Equity Holders of Caribevision TV and Caribevision Holdings fulfilled their obligations, although the inability of the Plans to become effective would have been the inevitable result.
[40] See emails attached to Motion to Reconsider (ECF #275-2).
[41] The Court notes that the Order Scheduling Confirmation (ECF #159) set the deadline to file the Plan Proponent Certificate on May 25, which was not a business day. Had the order been correct the certificate would have been due either May 22 or May 26.

Equity Holders were prevented from performing the balance of their obligations by the filing of the Motion to Modify and entry of the Modification Order. Thus, it appears the Court may need to have a short evidentiary hearing at which time the Pegaso Equity Holders will have to show they had the wherewithal to provide exit financing by the Effective Date as required by the Plans.[42]

Assuming the Pegaso Equity Holders demonstrate their ability and willingness to perform the exit financing at the relevant time and tender their share of the equity contribution, then the Reorganized Debtors will be required to rescind issuance of the shares to the Vasallo Group, refund to the Vasallo Group the excess portion of the equity contribution paid by the Vasallo Group and allocate the shares as provided in the original Plans. The Vasallo Group will be required to relinquish the portion of the shares that should have been issued to the Pegaso Equity Holders, since the releases do not release the Vasallo Group from its obligations under the Plans.

Once the new equity is allocated as provided in the Plans, then the shareholders can take their disputes to state court, because, at that point, this will become solely a dispute between shareholders, and this Court will not have jurisdiction to adjudicate those battles.

---

[42] The Reorganized Debtors argue that the Eleventh Circuit ruled that the only relief to which the Pegaso Equity Holders are entitled is to get a new disclosure statement, vote on confirmation, and file objections to the Modification. The Reorganized Debtors' argument continues that because it is clear the Pegaso Equity Holders would have objected, their objections would have been overruled, and the Plans would have been confirmed as modified and therefore the results would have been the same. That is not correct. The consequence of the Pegaso Equity Holders being deprived of notice and the opportunity to object was only one of the reasons for the Eleventh Circuit's ruling. The Eleventh Circuit found the Plans as modified were unconfirmable even in the absence of objection, without *consent* by the Pegaso Equity Holders to the treatment in the Modification, which consent, it is easy to say, would not have occurred.

The Pegaso Equity Holders will be the majority shareholders. The Vasallo Group will return to its role as the minority shareholder, as it has always been during the entirety of this business. The majority shareholders will take whatever actions they believe are appropriate and authorized by the governing non-bankruptcy law and corporate documents.  If permitted under applicable non-bankruptcy law, Mr. Vasallo can make whatever claim he believes he is legally entitled to make with respect to post-petition actions he claims to have taken and any "equitable adjustments" to which he believes he is entitled. The majority shareholders can, of course, raise whatever claims they believe they may have regarding any alleged wrongful post-Effective Date actions they assert against Mr. Vasallo, such as the allegations regarding the purchase of the property from Orly, and address the issues with the antenna and the salary.

The parties agree on one thing – they cannot be shareholders together anymore.  If that is the case, then there are  remedies available under applicable state law and the governing documents that existed as of the Confirmation Date.

## **CONCLUSION**

The Eleventh Circuit held that the Pegaso Equity Holders were deprived of certain protections so fundamental to the requirements of plan confirmation that the plan confirmation had to be reversed, at least in part. The Court does not believe the Confirmation Order needs further modification or clarification.  The Eleventh Circuit's ruling is clear.

There is a remedy. And, for all the reasons that the Court has set forth above, the Court **ORDERS** as follows:

1.      The Reorganized Debtors, the Vasallo Group, and the Pegaso Equity Holders are directed to reach out to the Court's courtroom deputy to schedule the evidentiary hearing on the issue of the Pegaso Equity Holders' ability to fund the line of credit in the amount required by the Plans by the Effective Date.

2.      The Vasallo Group is directed to tender to counsel for the Reorganized Debtors any and all certificates representing its interests in Caribevision Holdings and Caribevision TV.

3.      The Pegaso Equity Holders are directed to deposit in their own counsel's trust account the amount of $329,000.

4.      Upon the Court's conclusion of the evidentiary hearing, and assuming the Pegaso Equity Holders can demonstrate they would have been able to fund the line of credit in the amount required by the Plans by the Effective Date of the Plans, the Reorganized Debtors are directed to issue new stock certificates and any amendments to the Caribevision TV Operating Agreement, as well as any other documents necessary to reallocate the equity interests of Caribevision TV and Caribevision Holdings in accordance with this Order.

5.      Upon delivery of the $329,000 to counsel for the Reorganized Debtors, all necessary documents will be delivered to counsel for the Pegaso Equity Holders.

6.      Counsel to the Reorganized Debtors shall refund $329,000 to the Vasallo Group.

7.      Upon completion of the transfers described herein, the parties shall file a certificate of completion and the Court will set a final status conference.

# # #

Copies to:
Paul J. Battista, Esq.
Phillip M. Hudson, III, Esq.
Carlos E. Sardi, Esq.

*Attorney Hudson is directed to serve a copy of this Order on interested parties who do not receive service by CM/ECF, and file a proof of such service within two (2) business days from entry of the Order.*